COMMONWEALTH *v.* JOSEPH BURR SEN., JOSEPH BURR JR., AND JOSHUA BURR.

[Charged with conspiracy to cheat and defraud J. Lynch out of ten thousand dollars and upwards.]

AFTER many weeks consumed in hearing the evidence, and the remarks of counsel in the case, on the 10th November, 1843, the RECORDER gave the following opinion.

Without fear of contradiction, it can be said this case has undergone careful investigation. Under various forms, the circumstances connected with it, have received judicial consideration. The length of time since the ingredients of the offence now charged, have manifested themselves, the deliberation, ability, and assiduity, the commonwealth's counsel have brought to bear upon the preparation of their case, all combined, leave no doubt that this charge has been fully and fairly presented for a decision.

It is not my intention to dwell upon the items composing the amount of evidence adduced by the commonwealth to support its case; but content myself with dissecting the whole, and classing it under appropriate heads; thereby avoiding much difficulty in its consideration. With this view we are to inquire, 1. Was there a partnership between Joseph Burr Jr. and James Lynch? 2. When did it begin? 3. What was the nature of the transactions now complained of? 4. What

was the effect of the dissolution? And lastly, is any probable cause shown, on which to rest the charge of conspiracy as to these defendants?

The present proceedings have grown out of the acts of Joseph Burr Jr., one of the parties in this case, and they must be considered under the third head of the above enumeration, which also requires the examination of the first, second and fourth of the subdivisions. The prosecutor states in his evidence, that on coming to Philadelphia in the fall of 1836, he was induced to confer with Joseph Burr Jr., in regard to an association in business to be carried on at Tampa Bay, Florida. After one or more interviews, it was determined that he, Lynch, should obtain a warrant as a sutler to the U. S. troops stationed at Tampa Bay, which, having procured, he and Burr should there enter upon the management of the concern.

This warrant was obtained; Burr made purchases to a large amount, in the name of the firm, and sails from Philadelphia for the place designated, taking with him the goods. After continuing in business for some months, the partnership is dissolved. Lynch continues the business, having bought out the interest of his partners.

Some time after this dissolution, Lynch has cause to believe that his late partner had acted in a way not in conformity to the regular course of mercantile affairs.— He suspected him of misapplying partnership funds— using moneys belonging to both, for his individual use, and also neglecting to keep proper accounts of receipts and expenditures. Accordingly, civil proceedings were commenced against Burr, and by Burr against Lynch

in New Orleans, which have not at this time been fully settled.

On the dissolution of the partnership by the consent of the parties, a proposition was made by Burr to Lynch to buy or sell the interest of either in the co-partnership. After some hesitation, or rather reluctance to make any offer, Burr made a proposition to Lynch, the purport of which was, that he Burr, would give Lynch $500 for an offer of sale. A programme, estimate, or condition of such purchase was made by each to the other, which resulted in Lynch becoming the purchaser of Burr's interest; at the same time giving a penal bond in $9000, conditioned for the payment of the partnership debts in Philadelphia. On Lynch coming to this section of the country, various claims were made upon him under the conditions of his bond. The father of Joseph Burr, the late partner, made a large claim, and various other creditors of the concern, which Lynch, after some introductory legal steps were taken to enforce payment, settled and discharged.

Immediately preceding the payment, or rather the demand on him for the amount of their claims, due under the bond referred to, Lynch conceives, from knowledge which he was then daily acquiring, that these claims were unjust, and if Burr, his partner, had acted properly, and made a just disposition of the money of the concern, would never have accrued. He therefore institutes this charge, against those whom he believed had combined to obtain the funds of the concern, sent on to Philadelphia during its existence, and misapplied either to their own individual use or uses, or to some other object than the liquidation of the debts of the partnership. From the

information thus, and at the time spoken of, obtained by Lynch, it farther appeared that the transmission of the funds to Philadelphia, and the improper application of them, took place during the existence of their business relations, and that the father and brother of his late partner were privy to these improprieties.

This is a succinct history, a ground-plan of the case, without any reference to independent or individual facts which are in evidence to establish it.

I shall now proceed to examine the case as thus briefly presented, in the order first marked out.

From the testimony of the prosecutor, an agreement for a partnership existed between himself and Burr, in October, 1836. From the testimony of Mr. Bolby, a partnership did exist in December, 1836, for about that date goods were purchased in the name of the firm of "Burr & Lynch," but on the credit of Joseph Burr Jr., who represented himself as a partner of said firm. These goods were shipped, directed to Burr & Lynch, at Tampa Bay, the place of the firm's location. By letter of the prosecutor addressed to Joseph Burr Jr., November 10, 1836, this firm, or a firm, is recognised; and by the statement on oath before me of the prosecutor, that he had consented and agreed to the payment, out of the partnership funds, of the bills rendered for the goods bought by Joseph Burr, at the time of the consummation of the agreement to form such a business association, between Burr & Lynch, proves, beyond all doubt, that a firm did exist at the time these liabilities were entered into by Burr, on the partnership account, if not with the knowledge, by the subsequent approval and sanction of Lynch. This partnership was not only as between the

10

partners, but as to the world, and it was recognised and ratified by the voluntary obligation of Lynch to pay the debts contracted by Burr in Philadelphia, pursuant to the agreement of partnership entered upon in Philadelphia, and carried into effect at Tampa Bay.

No legal mind can doubt, that the acts of Burr Jr., were on account of the joint concern, and bound it, not only as between the partners themselves, but also as to the world; and whatever participation the father or Joshua had in it at that time, was bona fide. The very capital, in money, except $400 of Lynch's, was put in by Burr; and the credit on which the large amount of goods, which composed the first shipment to Tampa Bay, in the "Protection," was created by the joint exertions of the father and Joshua in aid of Joseph. To meet this credit, Burr & Lynch's notes were given; and Lynch agreed to the payment of these notes. This act alone, confirmed all the transactions of Joseph Burr Jr., and made them those of the partnership.

I am of opinion that the partnership legally existed at the earliest moment Joseph Burr Jr. did any act in the name of the firm, which Lynch afterwards confirmed. See Gow on Partnerships, p. 53, et supra; 3 Kent, p. 40, &c.

If, then, a partnership existed in November, 1836, or at whatever date it may have been, Lynch is bound by the acts of his partner.

And again at the dissolution, Lynch ratifies all the acts of his partner in Philadelphia, for without any proviso on the face of the instrument, Lynch binds himself in a penal bond, to pay the debts due in Philadelphia. Now it is impossible to believe that so intelligent a per-

son as Mr. Lynch would have entered into such a bond, if he had any doubts about the matter, information being within his reach, before he signed such an instrument. Nor would he have signed it if he had not thought he was doing a fair business transaction. He cannot now take any advantage of his own act to benefit himself. Notwithstanding this, Lynch afterwards, after time was given him to inquire into the whole matter, after his doubts and fears were raised as to the conduct of Burr, after the dissolution, when he had the control of the books, such as they were, he comes to Philadelphia, and deliberately settles the account of the father of his late partner, and debts due to other creditors, thereby admitting their justness, and his liability to pay them, first as partnership debts, and secondly, under his own express written penal obligation to do so.

If the payment of these debts under all the circumstances of time and place, when and where he had every opportunity of inquiring as to the disposal of the funds supposed to have been misapplied by his late partner, did not admit their justness and legality, it at all events in the most decided way, puts a negative on the fears and suspicions he had previously entertained, as to either dishonesty or fraud, in the business relations between Burr and himself. If it had not that effect, it must be taken as conclusive evidence of the existence of a partnership between Burr & Lynch, and the consequent legal rights of partners, as applied to it.

Having considered the legal effect of the first, second, and fourth of the subdivisions, we now come to the third. Partners are bound, and bind each other, by their individual acts. Each or either of the partners in a firm,

has the right of property and right of possession in the property of all. These two undeniable principles of law, will aid in examining the present question.

Whatever moneys, then, Joseph Burr sent to Philadelphia, he had a right to send, for in such sums of money, he had not only the right of possession, but the right of property, as well as the jus disponendi. The moneys were his, at all events he had prima facie right to them, and consequently he had the right to order the manner of disposing of them. See Fox *v.* Hanbury, Cowp. R. 445; Barn. & Ald. 395; 3 Johns. Rep. 68; 12 Mass. Rep. 54; and Pick. 360.

It is part of the present charge, among the overt acts, that large sums of money were appropriated to the individual use of Joseph Burr Jr., by his father and brother, that if the partnership moneys sent to Philadelphia had been properly appropriated, the present prosecutor would not have been forced to pay so large an amount of debts in Philadelphia, under his bond, and that the misappropriation was with the privity of Joseph Burr Sen. and Joshua; that Joseph Burr Jr., while a partner, kept no account of large receipts of moneys, nor of their disbursement, and that those sums have been improperly disposed of, that moneys were sent to pay debts during the partnership, and that such debts were not so paid, and that Mr. Lynch has been obliged to pay them a second time. It is also in evidence that Joshua Burr himself said that $5000 were taken for the individual use of Joseph Burr Jr., during the existence of the partnership.

These are the chief transactions charged as criminal

against these defendants. They embody all criminal ingredients of the charge against Mr. Burr and his sons.

Now, as to the participation of the father and brother in the transaction of the business of the partnership; all the money received by Joseph Burr Sen. and Joshua, came from a member of the firm. It came both from Lynch & Burr; it came to them legitimately, as far as appears. We will now suppose for an instant, $10,000 were used by the father and brother here, and used by them for their private purposes. How are they liable? The money came from the firm—came from one who had a right to, or an ownership in it; and it does not appear by any evidence, that either the father or brother knew it was not the property of Joseph Burr Jr., to do with it as he chose. The mere receiving the money by the parties here, does not bring home to them the knowledge of its being improperly taken, nor does their receiving it connect them with any intent to obtain it. No such knowledge is brought home to either the father or brother.

On the contrary, the settlement by Lynch, of Mr. Burr Sen's. account, admits that the money he charges to have been received, was properly received. It is not pretended but that Joshua paid the debts of Joseph Burr Jr., with the money he received; and how was he to know, even if he paid private debts of Joseph, that it was not his own money he used for that purpose? —money that Joseph had earned by his labours in the concern—money which he had expected to earn when Joshua and Joseph Burr Sen. aided him at the outset of the business, to gather as its results.

10*

There can be no larceny by either partner, of the
partnership's property of the other. This is well settled
law; consequently no crime can attach to him who
receives property of a partnership, from one member of
the company.

If, then, any money, or all the moneys sent to Phila-
delphia by Joseph Burr, had been appropriated by the
person receiving it to his own use, such appropriation
is not within the reach of the criminal law in Penn-
sylvania.

We now come to the last subject of inquiry. Is there
probable cause shown on which to rest the charge of
conspiracy to cheat?

Conspiracy in Pennsylvania is a common law crime;
it has never been the subject of statutory provisions,
which is a cause of regret. In England there are seve-
ral statutes punishing conspiracy, and in many of our
states a similar course has been adopted.

We are left, therefore, to seek a definition of conspi-
racy from the text-books and decisions.

"By the common law," says Burns, "there can be
no doubt, but that all confederates whatsoever, wrong-
fully to prejudice a third person, are highly criminal."
Burns' Justice—Conspiracy.

Lord Coke describes conspiracy as "a consultation
and agreement between two or more, to appeal or indict
an innocent person falsely and maliciously, whom ac-
cordingly they cause to be indicted or appealed, and
afterward the party is lawfully acquitted by a verdict
of twelve men." 3 Just. 143.

Blackstone narrows the crime to malicious accusa-
tions. 4 Black. Com. 136.

All confederacies wrongfully to prejudice another, are misdemeanors at common law. Hawk., b. 1, c. 72, l. 2.

A conspiracy to do any thing that is criminal per se, is indictable at common law. 5 Han. & Johnson 317.

Chief justice Gibson has decided that a combination is a conspiracy in law, whenever the act to be done has a necessary tendency to prejudice the public, or oppress individuals, by unjustly subjecting them to the power of the confederates. 1 Journal of Jurisprudence 235.

But the object of conspiracy, says Chitty, is not confined to an immediate wrong to particular individuals; it may be to injure public trade, to affect public health; to violate public police, to insult public justice, or to do any act in itself illegal. 3 Chitty Crim. Law 1139.

It has been decided that an indictment will not lie for a conspiracy to cheat and defraud a man by selling him an unsound horse; 1 Stark. R. 402. It has also been held that an indictment will not lie for a conspiracy to commit a civil injury, which is not in itself indictable. 5 Halsted 293.

In every case of conspiracy that can be adduced, the offence depends on the unlawful agreement, and not on the acts which follow it; the latter is but evidence of the former. 2 Burr. 993; 3 Burr. 1321.

This is deducible from all the cases on the question; but what kind of agreement is illegal, seems not yet precisely settled. The decisions do not appear quite in unison even with the points they profess to settle. 3 Stark. Crim. Law *1146.

In Pennsylvania, conspiracy at common law may be held to be any combination to do an unlawful act. The intent which governs the combination, makes the offence

criminal. And consequently, under this rule, the object of the combination may be lawful, yet the offence is complete, if the agreement to do it be unlawful. Yet even such cases have been decided not to come within a punishable conspiracy.

It would be difficult to reconcile the various decisions in the law of conspiracy, and by no means more easy would it be to say what is conspiracy, from the cases already cited.

There is no decision which, taken by itself, can be used as a standard by which to measure the degree of offence necessary to bring it within the limits of conspiracy, as now understood; in other words, there is no rule applicable to any state of facts. It is very clear, that great latitude has been taken in defining this crime; and so general has been the application of it in criminal practice, that almost any one may be made liable to it in his every day business.

The looseness of the law on this subject, is matter of regret, not so much because it is not susceptible of a clear definition, but because too little attention is paid to the subject, simply because all profess to understand it. The law itself contains valuable principles, to be applied properly, and in communities many instances occur where punishment is awarded to those who merit it, for conspiracies, who without such a law, would escape.

With these views I shall attempt to explain what I conceive to be conspiracy, and to what class of cases it should be circumscribed in its operation.

A conspiracy is a misdemeanor. It cannot exist but in connexion with some offence under the grade of a felony. For the moment a felony is the result of a con-

spiracy, the latter being the lesser in degree, merges in the former. If the felony is one which admits of accessories, the parties to the conspiracy which ended in the felony, are classed as principals and accessories, and this relative position is to be deduced from the facts. If the felony is one which does not admit of accessories, then all are principals.

There cannot be a misdemeanor and a felony arising out of the same acts and contemporaneous; the former dies at the birth of the latter. This is too plain to need any argument to prove it; it is too well known to be the theory of the law, to require any authority to support it.

This being true, as a consequence, no conspiracy will lie, where the acts done, amount in degree and criminality to a felony.

For example, if a conspiracy is charged thus: that a person conspired to obtain money from A.: the first question to decide is, would the obtaining the money by either of the parties charged, from A., amount to a larceny. If the facts and the law make it larceny, then there is no conspiracy, for if the other two of the parties charged were "particeps criminis," they are principals, and all would be guilty of the felony.

And again, suppose three persons should form a conspiracy to kill B., and the result of which conspiracy was, the killing by one, of B.—then there could be no conspiracy, for there would be murder. Murder as to the person by whose hand B. fell, and the participation in the crime by the others made them accessories.

Thus far the law is clear, and the hold it has on participators in the higher crimes is complete; to such, in cases as mentioned, the arm of justice is not too short,

to reach them. In the one case all are principals, in the second principal and accessories.

We will now suppose a case in which the same "heart fatally bent on mischief," appears in its wicked and depraved nature, warring against social order and the peace of society and the rights of persons. Suppose three persons conspire to obtain money from A., by cheating or some nice fraud, and succeed in the plans up to the moment of securing their object. They are suspected and the money saved. Had the money been taken, then there could be no difficulty in the case, for then the larceny would have been effected; but in the present example all is complete but the taking "feloniously." What punishment is to be awarded for the intent, the design, the heart and will and disposition, all as wicked and as much at variance with the law and disposed to violate the law, as though the larceny had been effected? How is such a case to be met, how such offenders? You cannot punish for the larceny, though the intent is clear, and the proof positive. no larceny has been committed. How then can the case be reached so as to punish the three persons concerned? The one who was the most prominent in the several acts tending to obtain the money from A., could be punished for an attempt to commit a felony, but not so the remaining two.

And again, in the case of the combination or agreement of the three persons to kill B., suppose the plans should have been executed and the attack on B. should not have proved fatal, or even dangerous, from certain causes. True, in such case the party attacking would be punishable for an assault and battery with intent to

kill, but how are the other two persons parties to the agreement, to be reached?

Here no doubt was the first source of difficulty in the administration of the laws, which led to the common law crime of conspiracy; in both the supposed cases the "particeps criminis" could be reached, and punished too, as severely as the most guilty, under the charge of "conspiracy." Most fortunate is it that in such cases a remedy is provided; but because there is a mode of punishment such as this for certain cases, it is not therefore to be used on all occasions. Let it be the "medicine, not the daily bread of the law." It may be fairly concluded that the real motive for the creation of conspiracy in the criminal code, was to mete out some punishment for unsuccessful attempts to commit a more serious crime, or to punish the agreement or combination to effect such purpose. Thus conspiracy has been classed among the offences against the right of persons. If this view be correct, conspiracy is the mode of punishing these parties, in a misdemeanor as conspirators, who, in cases of felony would bear relation to such felony, either as principals or accessories. In other words, conspiracy is a general term which was intended to include accessories in misdemeanors; or carrying the classification of principal and accessories which existed as related to felonies, down to misdemeanors, join all under the charge of a conspiracy.

If this was the rule of law in regard to conspiracies, it would be easy to determine what constitued the crime. No person could then be liable to the charge of conspiracy, unless their relation to the offence which was the object of the conspiracy, was such, as had the offence

been a felony, it would make them either principals or accessories. Or their participation in the illegal combination or confederacy, placed them quo ad such combination or illegal agreement or confederacy, in the same relation thereto, as if instead of it being a combination, it had been a felony and would have made them principals or accessories.

For example, if three persons had agreed and confederated to enter and rob a dwelling house—the one to procure the implements, the other to enter and carry away the goods, and the third to conceal and dispose of them. Had this been accomplished, all would have been principals; but the plan failed. Now the relative positions of the three to the robbery, would have made them principals, if the robbery had been effected, and therefore their positions or participation in the agreement to rob, would make them accessory to that misdemeanor, if it was susceptible of such subdivision; but as it is not, they are guilty of conspiracy.

The law as it now stands would include innocent men in a charge of conspiracy—for any three persons agreeing to do some act, which after the agreement to do it, might become criminal by the acts of two, and yet the proof of some criminal act by either of these latter, some overt act, may be given in evidence against the first, and convict him, when his participation was innocent, but the acts became subsequently criminal by the doings of the two last. Many such examples might be named.

I have cited authorities which are in direct variance with each other as to what constitutes a conspiracy. In one, an agreement between two or more to cheat by selling an unsound horse, is not a conspiracy—and the

other, the agreement itself is a conspiracy. If it be difficult to say what is conspiracy, should not some fixed rule be made, to point out who are conspirators?

When a conspiracy is charged, it must be shown to exist by overt acts, leaving the combination to be inferred therefrom; or by proof of the combination, to effect the object, legal or illegal. Proof of an overt act by one, in pursuance of a conspiracy by several, is sufficient to convict all; Collins *v.* Commonwealth, 3 S. & R. 220. In an indictment for a conspiracy to cheat, no overt act need be set forth; Commonwealth *v.* M'Kisson, 8 S. & R. 420. See also 7 S. & R. 478, which decides that a conspirator may be tried and convicted in the place where the overt act is done, in pursuance of such conspiracy, &c. This is the present rule. Now if to these inquiries was added, would the participation of the persons charged, render them liable as principals or accessories, if the case was a felony? then there would be a fixed, well determined standard, by which to decide if their participation in the conspiracy or combination, made them co-conspirators.

Let us in conclusion, apply these principles to the present case.

There is no agreement to cheat and defraud the prosecutor proved, nor do I find any probable cause shown from which to infer such agreement. If any exists it is inferential. Now from what is it to be inferred?—the sending money to Joseph Burr Jr., to his father or brother?—this he had a right to do. The use of such money by either, to pay the private debts of Joseph Burr Jr.?—this also they had a right to do, for neither they, nor he, could decide whether it was, or was not, his

11

share of the partnership funds, until a settlement between the parties. If they paid their private debts with money sent for the payment of partnership debts, with the knowledge of the three that it was not the disposition to be made of the money, it would not be the subject matter of a charge of conspiracy, unless they agreed never to pay those debts, for which such money should have been specifically used. No such agreement is pretended. Mr. Lynch negatived such a suspicion by agreeing to pay debts due in Philadelphia at the dissolution. The mere fact that more was found to be due than he expected, is not proof of an agreement of these parties not to have paid them, if the partnership had continued. Mr. Lynch's payment of Mr. Burr Sen.'s account, when he had it within his reach, to know how the money sent to Philadelphia had been applied, is evidence that such an agreement never existed to cheat and defraud him, as is alleged. The abstraction of the funds at the store in Tampa Bay by Joseph, if it was any improper taking, is not of itself sufficient to show any conspiracy, for as I said before, he had a right to take it.

The fact that at the dissolution, an offer was made by Joseph to buy Lynch's interest on the same terms he would sell, shows that there was no conspiracy to cheat Lynch, for all the acts charged as making the conspiracy, took place prior to such offer; by the terms of such offer the purchaser was to pay the debts in Philadelphia. The tenor of both the original rough draft, and the agreement of dissolution, dated September 23d, 1837, proves, I think, that the acts of both parties, and the agents in Philadelphia, were regarded by each as bona fide. In both these papers such are the terms proposed,

that no conspiracy could have existed, or Joseph Burr Jr., if it had, could have been no party thereto.

I cannot see any criminality in this case as against these parties. It was a business transaction between them, and the proper remedy is a civil suit. It would be straining the criminal law very far, it would be giving a still wider range to it, it would be making conspiracy the drag-net of the criminal law, if the acts of partners, and the agents of partners were, on other than the clearest grounds, to be made subject to its operations.

There are cases which might be brought within its grasp, of the nature referred to. Many of our banking institutions, loan companies, and even mercantile firms, might be subjected to the.infliction of the scourge of the criminal law—but in this instance, I cannot, as I regard the conscientious exercise of a high public duty, so construe the law and evidence, as to decide that proper ground is laid for holding these defendants to appear for trial.

*They are therefore discharged.*

*Lewis S. Carr & Edward E. Law, esqrs.*, for commonwealth; *J. M. Read & Arundel, esqrs.*, for defendants.